IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.

JOSEPH YOUNG,
*Defendant*.

Crim. No. ELH-13-151 (#25)

## MEMORANDUM OPINION

Joseph Young, a member of the Black Guerilla Family gang ("BGF"), was one of 44 defendants indicted in 2013 on charges that included Racketeering Conspiracy, under the Racketeering Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*; conspiracy to distribute and possess with intent to distribute controlled dangerous substances; and money laundering conspiracy. The charges were rooted in a pervasive criminal enterprise at the Baltimore City Detention Center ("BCDC"), a facility for pretrial detainees. The defendants generally consisted of two groups: BGF members who were inmates at BCDC, and corrupt correctional officers who worked at BCDC and helped to facilitate the enterprise. The Second Superseding Indictment (ECF 869) alleged that the racketeering enterprise spanned the period from 2007 to November 2013. *Id.* ¶ 11 at 6.[1]

Eight of the defendants, including Young, proceeded to a jury trial at which Judge J. Frederick Motz presided.[2] The trial began on November 17, 2014, and on February 5, 2015, the

---

[1] Citations refer to the electronic pagination as it appears on CM/ECF. The page numbers on the parties' submissions do not always correspond to the electronic pagination.

[2] This case was assigned to me at the time of indictment. I ruled on many pretrial motions, took many guilty pleas from codefendants, and conducted sentencing proceedings for the many codefendants who did not proceed to trial. However, Judge Motz presided at the trial and he imposed the original sentence on Young.

jury returned a verdict of guilty as to Young and four other defendants. ECF 1425; ECF 1426. Two of the five convicted defendants were BGF gang members who had been inmates at BCDC and three were correctional officers who worked at BCDC.

On June 24, 2015, Judge Motz imposed a fifteen-year sentence on Young. *See* ECF 1709 (Judgment docketed 6/30/15). On appeal to the Fourth Circuit, the court affirmed the convictions but vacated and remanded for resentencing of Young. ECF 1992; *see United States v. Carrington, et al.*, 700 F. App'x 224 (4th Cir. 2017). The case has been returned to me for resentencing.[3]

For the reasons that follow, I find that defendant has a total offense level of 31 and a criminal history category of IV.

## I.      Procedural Background

Young, known as "Monster," was convicted of Count One, under 18 U.S.C. § 1962(d), charging racketeering conspiracy through a pattern of five racketeering activities: conspiracy to distribute controlled substances, in violation of 21 U.S.C. § 846; distribution and possession with intent to distribute controlled substances, in violation of 21 U.S.C. § 841; bribery of a public employee (Maryland Code, Crim. Law Art. § 9-201); extortion and extortion by verbal threat (Maryland Code, Crim. Law Art. §§ 3-701, 3-705); and money laundering, in violation of 18 U.S.C. § 1956. In addition, the jury convicted Young of Count Two, charging conspiracy to distribute controlled substances, *i.e.*, oxycodone, including Percocet and Oxycontin; buprenorphine; marijuana; and alprazolam. And, Young was found guilty of Count Three, charging money laundering conspiracy, in violation of 18 U.S.C. § 1956(h). *See* ECF 1425 (Jury Verdict); ECF 1426 (signed jury verdict).

---

[3] At trial, on appeal, and in regard to the resentencing, Young has been ably represented by the same attorney.

Thereafter, an Amended Presentence Report (ECF 1643, "PSR") was prepared, dated May 7, 2015. The PSR found a Base Offense Level of 26, pursuant to §§ 2D1.1, 2S1.1, and 2E1.1 of the United States Sentencing Guidelines ("U.S.S.G.," the "Sentencing Guidelines," or the "Guidelines"), based on a drug quantity attributable to the defendant involving between 5.9 to 8.9 grams of oxycodone. *Id.* ¶ 26. That drug quantity corresponded to an offense level of 20, to which several enhancements were applied. *Id.* This resulted in a total offense level of 32. *Id.* ¶ 34. With a criminal history category of V (*id.* ¶ 44), the PSR reflected a Guidelines Range of imprisonment of 188 to 235 months. *Id.* ¶ 76.

Young disputed the facts and the guidelines calculations, including as to the drug quantity attributable to him and his role in the offense. *See* ECF 1643, ¶ 35. Young's version of events is set forth in ¶ 18 of the PSR. In light of the disputes, the probation agent expressly deferred to Judge Motz for resolution of them. *Id.* Both sides submitted sentencing memoranda. ECF 1685 (government); ECF 1686 (Young).

As noted, sentencing was held on June 24, 2015. ECF 1707. The PSR assigned a four-level enhancement for role in the offense, with which the government agreed. *See* U.S.S.G. § 3B1.1(a). But, Judge Motz awarded only a two-level increase. In all other respects, Judge Motz adopted the PSR. *See* ECF 1747 (Sentencing Transcript); ECF 1710 (Statement of Reasons); ECF 1715 (Amended Statement of Reasons). Therefore, Judge Motz found a total offense level of 30, a criminal history category of V, and an advisory sentencing guidelines range of 151 to 188 months' incarceration. *Id.*

The government sought a twenty-year sentence. But, Judge Motz imposed concurrent terms of fifteen years (180 months) as to Counts One, Two, and Three, as well as three years of

supervised release and a $300 special assessment.  *See* ECF 1709.  Thereafter, Young noted an appeal to the Fourth Circuit.  ECF 1712.

In an unpublished opinion issued July 25, 2017, the United States Court of Appeals for the Fourth Circuit affirmed the convictions of Young and all of the codefendants who were convicted at trial.  ECF 1992.  However, it vacated Young's sentence and remanded for resentencing.  *Id.*; *see Carrington*, 700 F. App'x 224.

The Fourth Circuit determined that Judge Motz "failed to resolve the factual disputes" raised by Young concerning the guidelines calculation as to "the drug quantity or offense role . . . ."  *Carrington*, 700 F. App'x at 234.  Moreover, Judge Motz did not "indicate that resolution was unnecessary because neither issue would affect [the court's] sentencing decision." *Id.* (citing Fed. R. Crim. P. 32(i)(3)(B)).  Rather, Judge Motz adopted the findings of the PSR, even though the PSR "did not make any findings regarding drug attribution or offense role for the district court to adopt . . . ."  *Id.*  Therefore, the Court vacated the sentence and remanded for resolution of the factual disputes and for resentencing.  *Id.* [4]

The government's resentencing memorandum is at ECF 2006, with several exhibits, and is supplemented by ECF 2013.  The defendant's resentencing memorandum is at ECF 2016, with sixteen exhibits docketed at ECF 2067-1 to ECF 2067-16.[5]  The government's reply is at ECF 2031, with numerous exhibits.  Other government sentencing submissions are docketed at ECF

---

[4] The Fourth Circuit did not address Young's challenge to the two-level upward adjustment for money laundering under § 2S1.1(b)(2)(B), or the two-level enhancement for bribery under § 2D1.1(b)(11).  *See id.* at 234, n. 3.  In this regard, the Court observed that the district court's resolution of the other disputes "may bear on application of those provisions . . . ."  *Id.*  The defendant has since abandoned his challenge to the bribery enhancement.

[5] Defense counsel initially submitted the exhibits to the Court via email.  At the Court's request, they were subsequently docketed on CM/ECF.  *See* ECF 2067.

2042; ECF 2043; ECF 2057; ECF 2070; ECF 2076; ECF 2081; and ECF 2084.[6]  Additional defense submissions are docketed at ECF 2032; ECF 2039; ECF 2040; ECF 2044; ECF 2045; ECF 2050; ECF 2051; ECF 2064; ECF 2065; ECF 2067; ECF 2080; and ECF 2083.  As the copious submissions suggest, counsel for both sides have advocated vigorously for their respective positions.

In response to issues raised by the Court, the government, through the case agent, FBI Special Agent Sarah Lewis, recently conducted interviews of two codefendants, both of whom testified at trial:  Tavon White and Katera Stevenson.  White was a BGF member, the leader of the nefarious operations at BCDC, and the lead defendant.  He pleaded guilty before me on August 6, 2013.  ECF 290.  The FBI reinterviewed White on December 6, 2017.  The Form 302 of the interview of White is docketed at ECF 2043-2.  Katera Stevenson pleaded guilty before me on September 17, 2013.  ECF 316.  She was reinterviewed on December 7, 2017.  The Form 302 of the recent interview of Ms. Stevenson is docketed at ECF 2043-1.

Young vigorously objects to the Court's consideration of such evidence.  He has moved to exclude the recent interview of White, as it took place years after the events at issue.  *See* ECF 2050; *see also* ECF 2044; ECF 2051; ECF 2064; ECF 2065.  Among other things, Young argues that White's recent statements contradict White's trial testimony.[7]

The government opposes the motion.  ECF 2057.  It argues that the interviews were conducted because the Court "seemed unsatisfied" with the government's evidence at resentencing, and notes that White's recent interview merely provides "greater specificity about

_____

[6] ECF 2013, ECF 2070, and ECF 2076 consist of numerous exhibits that were cited by the government in its various submissions and supplied to the Court upon my request.  I note that there are multiple copies of some exhibits.  In general, I have not included multiple citations for the same exhibit.

[7] Ms. Stevenson is not mentioned by the defendant in ECF 2050.

the Percocet business at BCDC and . . . Young's knowledge" of it.  *Id.* at 2.  Moreover, the government maintains that the Court may consider such evidence, pursuant to 18 U.S.C. § 3661.  *Id.*  Young has replied.  ECF 2064.

In order to resolve the issues of drug quantity attributable to Young and his role in the offense, I need not consider the recent interviews of White or Stevenson.  Because I decline to consider ECF 2043-1 and ECF 2043-2, I need not resolve the parties' dispute as to whether the Court is entitled to consider such statements.

In addition to the numerous submissions by counsel, evidence and argument were presented at resentencing hearings held on November 28, 2017, November 30, 2017, December 13, 2017, and March 1, 2018.  ECF 2036; ECF 2041; ECF 2046; ECF 2078.

## II.  The Presentence Report and the Guidelines

The Sentencing Guidelines are at the center of the parties' disputes.  The PSR grouped Counts One, Two, and Three together for Guidelines calculation purposes, pursuant to U.S.S.G. § 3D1.2(b) and (d).  ECF 1643, ¶ 25.  The parties do not dispute this grouping.  When counts are grouped together, the appropriate offense level is determined by "the highest offense level of the counts in the Group."  U.S.S.G. § 3D1.3(a).  Therefore, I must determine the offense level for each count, and apply the highest.  In performing these calculations, it is helpful to review the other findings of the PSR.

The applicable guideline for a violation of 18 U.S.C. § 1962(d), the racketeering offense, is found in U.S.S.G. § 2E1.1(a).  It provides that the Base Offense Level is the greater of (1) 19 or (2) "the offense level applicable to the underlying racketeering activity."

The PSR uses the conviction under 18 U.S.C. § 1956, for money laundering, as the "underlying racketeering activity."  ECF 1643 (PSR), ¶ 26.  The Guidelines section applicable to

money laundering offenses is § 2S1.1. That section, in turn, specifies to apply "the offense level for the underlying offense from which the laundered funds were derived." U.S.S.G. § 2S1.1(a)(1). The "underlying offense," according to the PSR, is the conspiracy to distribute and possess with intent to distribute controlled substances ("CDS"), in violation of 18 U.S.C. § 846. ECF 1643, ¶ 26. The Guidelines section for drug-related offenses is found in § 2D1.1.

According to ¶ 26 of the PSR (ECF 1643), Young's offense conduct involved 5.9 to 8.9 grams of oxycodone, the equivalent of 40 to 60 kilograms of marijuana. When the PSR was prepared in May 2015, that amount corresponded to a Base Offense Level of 20. U.S.S.G. § 2D1.1(b) pertains to "Specific Offense Characteristics." According to the PSR, because Young used or directed the use of violence, two levels were added under § 2D1.1(b)(2). *See* ECF 1643, ¶ 26. Further, because the object of the offense was the distribution of a controlled substance in a correctional or detention facility, two levels were added under § 2D1.1(b)(4). *Id.* And, because the defendant bribed or attempted to bribe a law enforcement officer (*i.e.*, correctional officer) to commit the offense, two levels were added under § 2D1.1(b)(11). *Id.* This gave Young an offense level of 26 for purposes of § 2D1.1.

As noted, the Base Offense Level for the money laundering count, determined in this case by § 2S1.1(a)(1), is the "offense level for the underlying offense." Because the PSR determined the drug offense to be the underlying offense for the money laundering count, the Base Offense Level under § 2S1.1 is 26. ECF 1643, ¶ 26. Paragraph 27 of the PSR indicated that, because the defendant was convicted under 18 U.S.C. § 1956, two levels were added under § 2S1.1(b)(2)(B), giving Young an offense level of 28 for the money laundering count.

Although the PSR included no further discussion of the RICO count, it is implied that the offense level for that count would also be 28. This is because, as noted, the offense level for the

RICO count under § 2E1.1 is either 19 or the offense level for the most serious underlying racketeering activity, whichever is higher. Accordingly, the offense level under § 2E1.1 would be either 19, the alternative minimum Base Offense Level for racketeering conduct, per § 2E1.1 cmt. 3; 26, for the drug conspiracy; or 28, for the money laundering. As 28 is the highest level, it becomes the Base Offense Level and the final offense level for § 2E1.1.

In addition, in ¶ 29 of the PSR, four levels were added under U.S.S.G. § 3B1.1(a) for role in the offense. In particular, the defendant was deemed an organizer or leader of a criminal activity involving five or more participants.

Therefore, according to the PSR, Young had a total offense level of 32. In addition, the defendant had a criminal history score of ten points, which established a criminal history category of V. ECF 1643; ¶ 44. The score of ten points was based on Young's three prior convictions (*id.* ¶¶ 39-41), and the PSR's finding that Young was on probation at the time of the underlying offenses. *Id.* ¶ 43.[8] From my review of the record, it does not appear that Young contested his criminal history. *See* ECF 1686; ECF 1747 (Sentencing Transcript).

According to ¶ 76 of the PSR, based on a final offense level of 32 and a criminal history category of V, Young's advisory sentencing guideline range called for a period of incarceration of 188 to 235 months.

At Young's sentencing in June 2015, the government argued that Young's Base Offense Level was a 20, because the criminal drug activity involved at least 5.9 to 8.9 grams of oxycodone. ECF 2006 at 3. At the time of the initial sentencing, that particular drug quantity corresponded to an offense level of 20. The government described that quantity as just "a tiny amount" of oxycodone. *Id.* However, because of changes to the drug quantity tables that went

---

[8] The PSR (ECF 1643) reflects, *inter alia*, prior convictions for armed robbery (¶ 40) and second degree assault (¶ 41).

into effect in November 2015, pursuant to Amendment 782, that quantity would now equate to an offense level of 18. *See* U.S.S.G. § 2D1.1(c). Nevertheless, the government maintains that defendant remains a Level 20 under the revised guidelines.[9]

According to the government, 35 codefendants agreed to plead guilty to crimes giving them a Base Offense Level of 20, including defendant's girlfriend, Raylanair Reese. *See* ECF 2057 at 18-19. Four others who were convicted at trial were also found to have a Base Offense Level of 20. *Id.* The government asserts that it selected a guideline level of 20 "as the floor offense level" because it "was such an absurdly small amount of drugs that none of the defendants could argue" that the quantity was not foreseeable. ECF 2031 at 10.

Both parties seem to agree that the first step in calculating Young's guidelines sentence is to determine the quantity of CDS for which he is accountable. Therefore, I turn to that issue.

### III. Drug Offense

#### A. Guidelines Factors

As noted, because Young has been convicted of a RICO offense, U.S.S.G. § 2E1.1(a) applies. It provides that the Base Offense Level is either (1) 19 or (2) the "offense level applicable to the underlying racketeering activity." Here, there are effectively two levels of underlying activity, because § 2S1.1 refers to an "underlying offense from which the laundered funds were derived." The underlying offense from which the laundered funds were derived is the conspiracy to distribute and possess with intent to distribute CDS, and therefore the Court looks to §2D1.1 as the applicable guideline. Under § 2D1.1(a)(5), the offense level is

---

[9] The government seems to suggest that, at the relevant time, it ascribed such a small quantity of drugs to Young and other codefendants (5.9 to 8.9 grams of Oxycodone) because, in accordance with the drug quantity table then in effect, that was all that was needed for an offense level of 20. The government also seems to suggest that it could have proven more, but it was not necessary for it to do so. It continues to argue for a Level 20, although the applicable drug quantity with respect to a Level 20 has increased since Young's first sentencing.

determined based on: 1) the quantity and type of drugs involved (laid out in § 2D1.1(c)) and (2) the applicable Specific Offense Characteristics, set forth in § 2D1.1(b).

Young insists that the Specific Offense Characteristics in Chapter Two do not apply when determining the offense level under U.S.S.G. § 2E1.1(a)(2). ECF 2083 at 1. He argues, ECF 2016 at 29:

> If the offense level from the amount of drugs reasonably forseeable to Mr. Young yields an offense level below 19, then the enhancements under USSG sec. 2D1.1(b) do not apply. As a result, the requested enhancements for bringing drugs into a correctional facility (sec. 2D1.1(b)(4)), for use of violence (sec. 2D1.1(b)(2) and for bribery (sec. 2D1.1(b)(11) *do not apply here*. (Emphasis added).

Young points out that Application Note 3 states that the court is to apply the enhancements under Chapter Three. ECF 2083 at 1. Further, he notes that § 2E1.1(a)(2) does not refer to U.S.S.G. § 1B1.3(a), which in turn includes Chapter Two enhancements. *Id.* at 2. He asserts, *id.* at 1: "Had the Commission intended for Chapter 2 to apply, all it had to do was add [it] to the Note. It chose not to." Therefore, he contends that if the *Base* Offense Level indicated by §2D1.1(a) (as to the quantity of drugs) is less than 19, the Court does not consider the Specific Offense Characteristics of §2D1.1(b). ECF 2016 at 19.[10]

Initially, the government appeared to agree with Young's view of the guidelines, based on the government's statements in its briefing and in court, and from its ongoing insistence that Young and other defendants who were involved in the conspiracy had an offense level of at least 20. *See, e.g.*, ECF 2031 at 21. At the hearing on March 1, 2018, the Court questioned counsel as

---

[10] Defendant initially recognized the application of an upward adjustment based on drug distribution in a detention facility. *See* ECF 2016 at 8. Later, defendant reiterated under § 2D1.1(b)(4) that no Specific Offense Characteristics apply because defendant's offense level is a 12. In response to the Court's inquiry about the apparent inconsistency, defendant acknowledges the error and has asked the Court to disregard the inclusion of the enhancement for drugs in the jail. ECF 2083 at 4.

to this issue, and invited memoranda.  *See* ECF 2081 (government); ECF 2083 (Young); ECF 2084 (government's reply).  The government now contends that the Specific Offense Characteristics *are* included in the calculation under § 2E1.1(a)(2).

To the extent that defendant believes that enhancements under § 2D1.1 do not apply if the Base Offense Level is below 19, he is incorrect.  U.S.S.G. § 1B1.5(b)(1) states: "An instruction to use the offense level from another offense guideline refers to the offense level from the *entire* offense guideline (*i.e.*, the base offense level, specific offense characteristics, cross references, and special instructions) . . . ." (Emphasis added.)

Section 2E1.1(a)(2) instructs the Court to use the "offense level applicable to the underlying racketeering activity."  Under § 2E1.1, the district court must "calculate independently the total offense level of each separate underlying offense and then select whichever is greatest (or 19, if that number is greater).[1]"  *United States v. Pratt*, 728 F.3d 463, 480 (5th Cir. 2013).  In turn, to establish that offense level, the court must consider *all* of §2D1.1.  As the *Pratt* Court explained, 728 F.3d at 480: "Unlike most other sections in Chapter Two, section 2E1.1 of the Guidelines does not provide for adjustments based on special offense characteristics, presumably because the district court will have already calculated the special offense characteristics applicable to the offense constituting the underlying racketeering activity."  *See also United States v. Anderson*, 526 F.3d 319, 327 (6th Cir. 2008) (calculating the offense level for money laundering, and stating that the offense level included § 2D1.1's Base Offense Level plus Specific Offense Characteristics).

The defendant argues, *inter alia*, that by his calculation, the total marijuana equivalent attributable to him is "6,700 grams (from oxycodone) plus 200 grams (from suboxone) and 20 grams from the phone call about marijuana," for a total of 7 kilos, which amounts to an offense

level of 12. ECF 2016 at 8. He acknowledges that, under § 2E1.1 of the Guidelines, the offense level is automatically increased to Level 19, because of the RICO conviction. But, he maintains that no enhancements apply. Conversely, the government insists that, using the current drug quantity table, the appropriate offense level begins at 20, before enhancements.

Section 2E1.1 does not foreclose consideration of Specific Offense Characteristics if the Base Offense Level, based on drug quantity, is 19 or less, as the defense seems to suggest. Rather, regardless of the starting point (*e.g.*, a Base Offense Level of 12), the court must consider the Specific Offense Characteristics. The correct offense level is derived, in this case, from the quantity and nature of the drugs attributable to Young, plus any applicable Specific Offense Characteristics, as defined in §2D1.1(b). Following this step, any applicable Specific Offense Characteristics of § 2S1.1 would be added. *See* § 2E1.1(a)(2). If that number is less than 19, Young's Base Offense Level under §2E1.1(a)(1) becomes 19. If that number is higher than 19, it becomes Young's Base Offense Level for the RICO offense, under § 2E1.1(a)(2).

### B. Legal Standard

The analysis of drug quantity attributable to a defendant begins with reference to U.S.S.G. § 1B1.3, titled "Relevant Conduct (Factors that Determine the Guidelines Range)." Section 1B1.3(a) provides, in part, that the Base Offense Level shall be determined on the basis of the following:

> (1) (A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and
>
> (B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all acts and omissions of others that were—
>
> (i) within the scope of the jointly undertaken criminal activity,

(ii)    in furtherance of that criminal activity, and

(iii)    reasonably foreseeable in connection with that criminal activity;

that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;

Application Note 3A states, in part, that only "the conduct of others that meets all three criteria set forth in subdivisions (i) through (iii) … is relevant conduct under this provision." If "the conduct of others does not meet any one of the criteria set forth in subdivisions (i) through (iii), the conduct is not relevant conduct under this provision." *Id.* Further, Note 3B cautions: "Because a count may be worded broadly and include the conduct of many participants over a period of time, the scope of the 'jointly undertaken criminal activity' is not necessarily the same as the scope of the entire conspiracy, and hence relevant conduct is not necessarily the same for every participant."

Note 3B addresses the timing of a defendant's entry into a conspiracy. It states: "A defendant's relevant conduct does not include the conduct of members of a conspiracy prior to the defendant joining the conspiracy, even if the defendant knows of that conduct . . . ."

Moreover, in discussing the application of the Guidelines with regard to drug conspiracies, Note 3D states, in part: "With respect to offenses involving contraband (including controlled substances), the defendant is accountable under subsection (a)(1)(A) for all quantities of contraband with which he was directly involved and, in the case of a jointly undertaken criminal activity under subsection (a)(1)(B), all quantities of contraband that were involved in transactions carried out by other participants, if those transactions were within the scope of, and in furtherance of, the jointly undertaken criminal activity and were reasonably foreseeable in

connection with that criminal activity." And, reasonable foreseeability "applies only in respect to the conduct (*i.e.*, acts and omissions) of others under subsection (a)(1)(B)." *Id.*

This case does not involve any substantial drug seizures. Therefore, under U.S.S.G. § 2D1.1, Application Note 5 is pertinent. It provides that, in such a case, the court may "approximate the quantity."

As noted, Young contends that the drug amount for which he can be held accountable under § 1B1.3 corresponds to a Base Offense Level of 12, according to the table in § 2D1.1(c). The government insists that the evidence readily establishes a drug quantity that corresponds to at least the current Level 20.

The parties focus primarily on the defendant's involvement with oxycodone, the active ingredient in Percocet pills. Currently, in order to qualify for a Level 20, the defendant must have reasonably foreseen drug trafficking of at least 8.9 grams of oxycodone. The government correctly advises that 9 grams of oxycodone is equivalent to 9,000 milligrams or just 300 oxycodone pills containing 30 milligrams each. ECF 2006 at 11; ECF 2057 at 15 n.3. *See* U.S.S.G. § 2D1.1(c)(10) and § 2D1.1(c), cmt. 8(D), at page 166 (equating 1 gram of oxycodone to 6700 grams of marijuana, which equals 6.7 kilos). In its view, that is not a large quantity of oxycodone.

Under U.S.S.G. § 1B1.3(a)(1)(B), the defendant is accountable for the conduct of others that was: "(i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity." In this regard, Young does not dispute his membership in BGF, but he observes that membership in BGF is not illegal. Moreover, Young insists that his membership and role in BGF is not the same as membership and role in the RICO conspiracy. According to the defendant, he was "a

small, minor player in the RICO drug conspiracy" and "[t]his distinction affects directly" the guidelines calculation. ECF 2016 at 1; *id.* at 24. To illustrate, Young points out that his role in the drug network was not mentioned in the intercepted calls between Young and White. *Id.* at 24.

Notably, Young argued at trial that, to the extent he was involved in a conspiracy, it was not the RICO conspiracy with Tavon White. However, the trial court thoroughly instructed the jury as to the RICO conspiracies (*see* ECF 1777, Tr. of 2/2/15), and the jury convicted Young of the RICO conspiracy. *See* ECF 1426.

*United States v. Bell*, 667 F.3d 431, 441 (4th Cir. 2011), is instructive. There, the Fourth Circuit said: "In conspiracy cases, base offense levels are determined based on 'all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant,' as well as the 'reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity.'" (Quoting U.S.S.G. § 1B1.3(a)(A) & (B)). The Court made clear that, with respect to controlled substances and jointly undertaken criminal activities, "the Guidelines hold a defendant 'accountable for all the quantities of contraband with which he was directly involved and . . . all reasonably foreseeable quantities of contraband that were within the scope of the criminal activities that he jointly undertook.'" *Bell*, 667 F.3d at 441 (citation omitted).

The case of *United States v. Flores-Alvarado*, 779 F.3d 250 (4th Cir. 2015), is also instructive. In that case, the defendant pleaded guilty to conspiracy to distribute and possess with intent to distribute 5 kilograms or more of cocaine and 1,000 kilograms or more of marijuana. As to sentencing, the Fourth Circuit reversed the district court because it failed to make the requisite factual findings with respect to the drug quantity attributable to the defendant.

In that case, the presentence report determined that the defendant was accountable for the equivalent of 31,111.16 kilograms of marijuana, which included drug quantities found at locations in North Carolina and Kentucky. The defense filed numerous objections to the proposed drug quantity attributed to the defendant, including as to seizures from two residences involving other drug dealers. The government maintained that it was foreseeable to the defendant that, at those locations, the drug suppliers would have on hand quantities exceeding the amount the defendant sought to purchase. *Id.* at 254. The district court agreed with the government.

The Fourth Circuit acknowledged that "sentences imposed for drug offenses are driven by the quantity of drugs involved." *Id.* at 255. Further, it stated, *id.*: "Under the Guidelines, the drug quantities that may be attributed to the defendant include the quantities associated with the defendant's offense of conviction and any relevant conduct." (citing *United States v. Gilliam*, 987 F.2d 1009, 1012-13 (4th Cir. 1993)). It explained that in a conspiracy case, relevant conduct includes "'all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity.'" (Quoting U.S.S.G. § 1B1.3(a)(1)(B)). The Court made clear, as the Guidelines point out, that "'the scope of the criminal activity jointly undertaken by the defendant . . . is not necessarily the same as the scope of the entire conspiracy, and hence relevant conduct is not necessarily the same for every participant . . . .'" *Id.* at 255 (italics omitted) (quoting U.S.S.G. § 1B1.3, former cmt. 2[11]). The Court added: "'The conduct of others that was both in furtherance of, and reasonably foreseeable in connection with, the criminal activity jointly undertaken by the defendant is relevant conduct under this provision. The conduct of others that was not in furtherance of the criminal activity jointly undertaken by the

---

[11] U.S.S.G. § 1B1.3 has subsequently been amended, and this Application Note is now at § 1B1.3, cmt. 3.

defendant, or is not reasonably foreseeable in connection with that criminal activity, is not relevant conduct under this provision.'" *Id.* (quoting U.S.S.G. § 1B1.3, former cmt. 2) (emphasis omitted).

The Fourth Circuit emphasized in *Flores-Alvarado* that "foreseeability is not enough; the acts of others may be attributed to a defendant only if those acts were foreseeable to the defendant *and* were within the scope of the defendant's agreement to jointly undertake criminal activity." *Id.* at 256 (emphasis in original). Therefore, the Court said: "'[I]n order to attribute to a defendant for sentencing purposes the acts of others in jointly-undertaken criminal activity, those acts must have been within the scope of the defendant's agreement *and* must have been reasonably foreseeable to the defendant.'" *Id.* at 255 (quoting *Gilliam*, 987 F.2d at 1012-13) (emphasis added in *Flores-Alvarado*); *see also* U.S.S.G. § 1B1.3, cmt. 3. Further, the Court underscored that the sentencing court "must make particularized findings" as to both the scope of the defendant's agreement and the foreseeability of the conduct in issue. *Flores-Alvarado*, 779 F.3d at 256 (emphasis omitted); *see also United States v. Bolden*, 325 F.3d 471, 499 (4th Cir. 2003).

As indicated, this is not a case in which drug quantity may be proven by actual drug seizures. Therefore, as the *Bell* Court recognized, the government may present evidence "from which the sentencing court may 'approximate the quantity.'" *Bell*, 667 F.3d at 441 (citation omitted). Similarly, in *United States v. Crawford*, 734 F.3d 339, 342 (4th Cir. 2013), the Court observed that the Guidelines "make clear" that, "'[w]here there is no drug seizure or the amount seized does not reflect the scale of the offense, the court shall approximate the quantity of the controlled substance.'" (quoting U.S.S.G. § 2D1.1, cmt. n.5). And, so long as the information has sufficient indicia of reliability, a court may consider relevant information, "without regard to

its admissibility under the rules of evidence applicable at trial . . . ."  *Crawford*, 734 F.3d at 342. Moreover, negotiated but undelivered amounts of drugs generally may be considered.  *See United States v. Brooks*, 957 F.2d 1138, 1150-51 (4th Cir. 1992).

In an effort to analyze the issue of the drug quantity (and role in the offense), 18 U.S.C. § 3661 is also pertinent.

Most of the factual evidence recounted in this Memorandum Opinion derives from the trial.  But, where noted, *infra*, the Court has considered a limited amount of evidence that was not introduced at trial or that was introduced but stricken from the record by Judge Motz, generally as prejudicial to the defense.  However, under 18 U.S.C. § 3661, the court may consider evidence not presented at trial.  The statute provides:  "No limitation shall be placed on the information concerning the background, character, and *conduct* of a person convicted of an offense . . . for the purpose of imposing an appropriate sentence."  (Emphasis added).

Section 3661 of Title 18 "codifies the longstanding principle that sentencing courts have broad discretion to consider various kinds of information."  *United States v. Watts*, 510 U.S. 148, 151 (1997) (per curiam); *see also Pepper v. United States*, 562 U.S. 476, 487 (2011); U.S.S.G. § 1B1.4.  Moreover, "[t]he plain language of § 3661 makes no distinction between a defendant's initial sentencing and a subsequent resentencing after a prior sentence has been set aside on appeal."  *Pepper*, 562 U.S. at 491 (concluding that, on resentencing, the court may consider evidence of a defendant's rehabilitation since his initial sentencing).

Of import here, the right of confrontation under the Sixth Amendment is not applicable at sentencing, nor is the Court barred from considering hearsay.  *Williams v. New York*, 337 U.S. 241, 246-51 (1949); *see also* Fed. R. Evid. 1101(d)(3).  Nevertheless, and as the government recognizes (ECF 2057 at 4), the Due Process Claus is not "completely extinguished" at

sentencing. Therefore, a defendant "has a right not to be sentenced on the basis of misinformation of a constitutional magnitude." *United States v. Bowman*, 926 F.2d 380, 382 (4th Cir. 1991) (quoting *United States v. Tucker*, 404 U.S. 403, 447 (1972)). Moreover, "where the sentencing judge relies upon prejudicial hearsay information, the accuracy of which is questioned, fundamental fairness requires that a defendant be given at least some opportunity to rebut that information." *United States v. Harris*, 558 F.2d 366, 374 (7th Cir. 1977). And, "Due process requires that some minimal indicia of reliability accompany a hearsay argument." *United States v. Egge*, 223 F.3d 1128, 1132 (9th Cir. 2000); *see also* U.S.S.G. § 6A1.3(a).

With the legal framework outlined above in mind, I turn to the factual analysis.

### C. Facts Pertinent to the RICO Conspiracy[12]

The charged conspiracy began in 2007. The conspiracy extended to four prison buildings, collectively referred to as BCDC. Tavon White, the lead defendant, arrived at BCDC in December 2009. ECF 2067-1 at 1. He left in February 2013. *Id.* at 3.

In March 2012, Young was initially detained in Central Booking, a part of BCDC. When Young arrived at BCDC, the racketeering conspiracy was well entrenched. As the government correctly observes, the RICO conspiracy was not Tavon White's conspiracy. Rather, at the relevant time, White was detained at BCDC and he was the BGF member in charge of drug trafficking and other matters at BCDC, on behalf of BGF. White's "authority at BCDC came from people outside the jail." ECF 1758 (Tr. of 12/15/14), at 15. Clearly, the criminal enterprise at BCDC long preceded White's incarceration.

---

[12] The government frequently attached as exhibits excerpts from the testimony at trial, without reference to the date or ECF. *See, e.g.*, ECF 2006-8; ECF 2006-11; ECF 2081-3. I note that White's testimony appears in five different trial transcripts.

Young moved to Tier D in July 2012. According to the defense, that is the earliest date by which Young would have had an opportunity to become involved with White. ECF 2016 at 15. Young left BCDC on January, 11, 2013. Therefore, the defendant claims a maximum period of nine months in which Young could have been involved in the RICO conspiracy. Conversely, the government contends that the defendant's involvement in the RICO conspiracy preceded July 2012, and began while he was housed in other parts of BCDC.

In my view, the evidence, discussed *infra*, established that Young was part of the RICO conspiracy prior to July 2012, when he moved to Tier D.

Young insists that he was "a very small part" of the RICO conspiracy. ECF 2016 at 4. Further, he claims that the evidence shows that he had just two sources of contraband, one of whom provided him only with tobacco. *Id.* Young acknowledges that the evidence established that his girlfriend, Raylainair Reese, provided him with Percocet pills. However, he maintains that there was little testimony as to the number of pills or the amount of narcotics Reese provided. *Id.* Young points "to the lone exception" that on one occasion Reese brought three Percocet pills to Young. Also, Young claims that Reese provided him with fewer than ten Suboxone strips. *Id.* And, according to Young, there was no evidence that he knew of the extensive drug conspiracy at BCDC. *Id.* Indeed, he maintains that he and White did not get along and did not work together in regard to drug trafficking, nor was he aware of White's drug trafficking conduct. In my view, Young has overlooked considerable evidence to the contrary.

This Court presided over the guilty pleas of many codefendants, including Raylanair Reese and Kimberly Dennis. At their respective guilty pleas, each agreed, under oath, to the statement of facts set forth in their respective plea agreements. As to the issues now pending, the Court may consider these sworn statements, because the statements of fact bear indicia of

reliability. In this regard, I note that they were made under oath; many of the factual admissions were corroborated by other evidence; and the statements are "internally consistent with the totality of the evidence in the record . . . ." *United States v. Hankton*, 432 F.3d 779, 791 (7th Cir. 2005) (noting that district court properly considered plea agreements of codefendants in determining drug quantity).

Reese, Young's girlfriend, entered a plea of guilty before me on August 29, 2014. ECF 974. The Plea Agreement is docketed at ECF 977. Paragraph 6 of Ms. Reese's Plea Agreement contains the agreed upon facts. ECF 977, ¶ 6.

Paragraph 6 said, in part: "Working on behalf of Joseph Young a/k/a Monster, in 2012-13, the Defendant Raylanair Reese picked up marijuana, Suboxones, Percocet pills, cell phones, tobacco and other contraband from sources outside Baltimore City Detention Center ('BCDC') and either smuggled them through the Visitor's Room at BCDC or turned them over to another person to smuggle them into BCDC." *Id.* Further, it states, *id.*: "Reese also facilitated payments for the drugs by loading 'Money Paks' for Young on a Green Dot and transmitting the numbers to others or loading them herself onto Green Dot cards." Reese agreed that she could reasonably foresee that BGF smuggled various drugs to BCDC in a quantity then equivalent to a Level 20 under the guidelines, "taking into account all the different drugs" that were charged in Count One. As noted, at that time, Level 20 corresponded to 5.9 to 8.9 grams of oxycodone, or 40 to 60 kg of marijuana. ECF 977, ¶ 6.

I also took the guilty plea of codefendant Kimberly Dennis on October 29, 2013. ECF 395. Her plea agreement is docketed at ECF 842.

Ms. Dennis was a correctional officer at BCDC from 2006 to 2013. She agreed, under oath, that she smuggled contraband into BCDC "for inmate and BGF leader Joseph Young, a/k/a

'Monster.'" ECF 842, ¶ 6. Moreover, she admitted, that she "was well-aware that Young was a BGF leader and assisted in furthering the racketeering enterprise." *Id.* Taking into account all of the different drugs involved in the conspiracy, she agreed to a Base Offense Level of 20, then equal to 5.9 to 8.9 grams of Oxycodone, as the quantity reasonably foreseeable to her, based on the many different drugs involved in the BGF smuggling activity at BCDC. *Id.*

As part of her plea agreement, Ms. Dennis had agreed to cooperate and testify at trial. However, on December 22, 2014, she reneged on her agreement. *See* ECF 1518 at 4. *Id.* Therefore, in connection with Young's resentencing, the government introduced as an exhibit the ten-page Form 302 prepared by the FBI based on its interview of Ms. Dennis on August 8, 2013. *See* ECF 2081-1 at 5-14; *see also* ECF 2037; ECF 2038. As will be shown, the Form 302 is largely corroborated by the evidence at trial. The Form 302 reflects that Ms. Dennis identified a photo of Young; she stated that Young "ran the floor" at BCDC; he was "the leader of his tier/area"; and Young recruited Dennis in October 2012 to smuggle contraband for him. *See* ECF 2081-1 at 8. Notably, she described Young as "directly underneath" White in the chain of command at BCDC. *Id.*

Dennis supplied Young with tobacco. Dennis also recalled that she obtained around 20 Percocet pills for him, of an unspecified milligram strength. In addition, Dennis "worked out an arrangement" to supply marijuana to inmate Derius Duncan, known as "Little D" (ECF 2006-8 at 7), while also providing tobacco to Young. ECF 2081-1 at 8. And, Dennis purchased about 50 Percocets for Duncan, 5 milligrams in strength. *Id.* at 7.

FBI Special Agent Sarah Lewis, the case agent, testified credibly at the resentencing hearing on November 28, 2017. She stated that Young owed Dennis about $800 for pills and tobacco. And, financial records, which were incomplete, showed he had paid Dennis around

$1,250.  *See also* ECF 2081-1 at 8.  Young concedes payment of that sum (ECF 2016 at 6), but contends it was for tobacco.  Even if it were for marijuana, he argues that "$1,250.00 buys only an unusually small amount of marijuana."  *Id.*

According to the government, Young was the only trial defendant whose contraband cellphone was among the ten phones intercepted during the investigation.  Phone calls were played at trial between Young and Dennis and between Young and Reese, concerning the smuggling of contraband at Young's direction.  ECF 2031-20 is a thirty-page summary prepared by Agent Lewis referencing some of the many phone calls and texts between Young and Dennis and Young and Reese related to drug matters, along with transcriptions.

As indicated, Dennis brought marijuana to inmate Derius Duncan, who was housed on C Section of BCDC, and tobacco to Young, who was housed on Tier D.  She also brought Percocet pills for both of them.  As the government maintains, various phone calls and text messages "illustrated the alliance" between Dennis, Young, and Duncan as to tobacco and marijuana.  ECF 2006 at 7; ECF 1756 (Tr. of 12/3/14), at 80.  In a text message between Young and Dennis on October 15, 2012, Young wrote:  "[G]ive me the brown and him the green . . . we can team up . . . and we can work on the pills."  ECF 2039-1 at 1; ECF 2031-22.  The "brown" referred to tobacco and the "green" referred to marijuana.  The government correctly attributes to Young the contraband that Dennis smuggled to Duncan, including Percocet pills, because of the "three-way deal" between Duncan, Young, and Reese.  ECF 2006 at 8.

Young and Dennis spoke by phone on October 24, 2012.  Young said, in part:  "I sell each piece for $100 . . . ."  ECF 2039-3 at 2.  Dennis asked Young:  "[H]ow many do you want to do a week, cause . . . I don't want you to have too much and it be sitting and then it get took."  *Id.* at 3.  Young also tried to recruit Dennis to join BGF.  ECF 2006 at 9 (citing "TX 28, p. 109;

TX 30, p.111; TX 32, p.113").[13] *See* ECF 2070-3 at 28-32. Young told Dennis, in part: "I'm all about money, power and respect." ECF 2070-3 at 16.

As the evidence showed, Reese provided Young with Percocet pills and buprenorphine strips. Law enforcement conducted a search of Reese's residence in May 2012. ECF 1759 (Tr. of 12/16/14), at 30-31. Baltimore City Police Detective Michael Boyd testified that numerous items of relevance were recovered from Reese's bedroom. Some of the documents establish Young's involvement with drug trafficking prior to July 2012. *Id.* at 31, 41. The letters include words in Swahili and also refer to Reese as Young's "wifey." *See*, *e.g.*, ECF 2070-2 at 11-12; ECF 2070-4 at 27-28.

In a letter with a date of 3/20/12" (ECF 2070-2 at 10), Young thanked Reese for the "dot's." And, he said: "Someone came in . . . . She said she will do the pills for me." *Id.* He included a "P.S." that said: "She just came back . . . call her $200 for 50 pills." *Id.*[14]

In a letter of April 10, 2012, Young wrote: "Mom said she will give me 20 pills Monday, but I'll try to get some money to get more. The more the better." *Id.* at 36. In another letter from Young to Reese, dated April 15, 2012, Young said, in part: "First we need as many pills as we can get, then use the money to get a phone. . . ." *Id.* at 37; *see* ECF 2070-2 at 24. As to money, Young wrote: "That 400 from the card will help out a lot, find that money . . . can a new one be sent out or can they put the money on other cards . . . ." ECF 2070-2 at 24.

Government Trial Exhibit RA-10 is a letter written by Young to Reese in an envelope postmarked April 30, 2012. ECF 2070-2 at 34. Young said, in part, *id.* at 36: "I try to keep myself busy . . . and make a few dollars for us . . . ." *Id.*

---

[13] These documents were subsequently submitted, at the Court's request, and are docketed, respectively, at ECF 2070-3 at 28; 30, 32.

[14] I have omitted the phone number that was included in the correspondence.

Intercepted telephone calls and text messages are also relevant. In a text message from Reese to Young on November 7, 2012 (ECF 2070-3 at 21), Reese wrote, in part: "Bae I found a old lady with the buke strips, 4$ each !!!." *See also* ECF 2031-20 at 1. Young responded, in part: "Get some . . . ." ECF 2031-20 at 8. The next day, Young texted Reese, asking: "Oh you grab them strips last night?" ECF 2031-20 at 9.

Young and Reese spoke by telephone on November 8, 2012. ECF 2067-15; ECF 2031-20 at 10. Young said, *id.*: "I was thinking 'bout trying to get an ounce of loud [*i.e.*, marijuana[15]] and just bag it up. Um, bag up twenty eight bags cause you know there twenty eight grams in a ounce. Just um, bag up twenty eight that's [$]1,400 right there, off of every ounce. So even if I pay [$]350 for it or whatever, I still make like, [$]1050 extra." Young added that this was his "next move . . . ." ECF 2067-15 at 2; ECF 2031-20 at 11.

In a telephone conversation between Young and Reese on November 13, 2012 (ECF 2067-13; ECF 2031-20 at 12), Young said, referring to Percocet pills: "I don't want no 30's." *Id.* at 1. Instead, he wanted three 10s. *Id.*

Young and Reese again spoke by telephone November 14, 2012. Young recounted to Reese that he was caught with pills hidden in trash that he was carrying, and he had to "throw the pills in [his] mouth . . . ." ECF 2031-20 at 17; *see id.* at 14-18. In a call on December 1, 2012, Reese told Young that she could have brought 10 "percs" for him, but she would bring them the following week. *Id.* at 23.

In a conversation on December 3, 2012 (*id.* at 24), Young told Reese to "[g]et a couple of them," referring to "bute strips." *See also id.* at 25. In another conversation on that date, Young and Reese discussed "butes" and "percs." *Id.* at 26-27. And, in a text message on that date,

---

[15] White testified at trial that "loud" and "green" referred to marijuana or weed. ECF 1756 (Tr. 12/3/14) at 88, 91.

Reese advised that the source had "30 bukes," and Reese "got 8 already . . . ." *Id.* at 29. Reese also told Young she could "grab some more . . . ." *Id.*

At trial, Tavon White described himself as "the overseer of the jail." ECF 1758 (Tr. of 12/15/14), at 153. But, he testified that he had not yet achieved the rank of Bushman. In contrast, Young was one of four BGF members incarcerated with White at BCDC who held the rank of Bushman. White was present when Young took an oath at the institution. *Id.*[16] As to the BGF rank of Bushman, White explained that a Bushman "ranked higher" than he did but did not have as much authority in the jail itself. ECF 1758 (Tr. of 12/15/14), at 14. Although Young actually outranked White in BGF, at BCDC White was the head of the criminal drug enterprise. *See*, *e.g.*, ECF 1758 at 15.

According to White, BGF operated by way of "33 constitutions." ECF 1755 (Tr. 12/2/14), at 16. White testified that Rule 15 applied to contraband trafficking at BGF. *Id.* That rule said: "We do not forge any ties under any banner except BGF." *Id.* Therefore, as a member of BGF, Young was subject to that provision. Moreover, at BCDC only BGF members were allowed to sell drugs; others who did so had to pay a "tax" of 10% of the profits. *Id.* at 10. In addition, BGF controlled the "working man positions" at BCDC, which enabled individuals to move between tiers and deliver contraband. ECF 1754 (Tr. of 12/1/14), at 32.

White testified that he made between $10,000 and $20,000 a month distributing contraband at BCDC. ECF 1755 (Transcript of 12/2/14), at 120. And, some months he made even more money. *Id.* White split his contraband with codefendant Carrington, known as "Rutt." ECF 1761 (Tr. of 12/18/14), at 72. Codefendant Jamar Anderson, known as "Hammer,"

---

[16] In its Opinion, the Fourth Circuit described Young as "a high-ranking BGF member" who "sold controlled substances in the jail." *Carrington*, 700 F. App'x at 226.

was White's "tighest buddy" at BCDC, and the two spoke every day. ECF 1755 at 118. According to White, Hammer made about the same amount of money as White made. *Id.* at 120.

Katera Stevenson, a supplier of contraband, was one of 24 correctional officer defendants convicted in this case. She testified at trial pursuant to a plea agreement. ECF 1760 (Tr. of 12/17/14), at 162. Stevenson was a correctional officer at BCDC in 2008, and then returned to that position from 2011 to January of 2013. *Id.* at 164-65; 167; 169; 190.

Stevenson testified that she obtained Percocet pills for White and Carrington three to five times a week, for a period of three to four months, in varying milligram sizes (7.5 mg., 15 mg., 30 mg.). *Id.* at 187; *see also id.* at 177-86.[17] Significantly, each delivery of pills consisted of 100 to 500 pills. Stevenson testified that a person known as "Fat Boy" was the primary source of her supply of Percocet pills. *Id.* at 185. However, she also obtained drugs from Ralph Timmons. *Id.* at 211.[18] Notably, Stevenson claimed that she made about $10,000 to $15,000 a week by supplying Percocet pills at BCDC. *Id.* at 221. In particular, she received $25 per Percocet. ECF 1761 (Tr. 12/18/14) at 57, 72.

Of relevance here, White testified at trial that Young had Percocet pills on D Section of BCDC "on numerous occasions." ECF 2051-4 at 1; *see* ECF 1754 (Tr. 12/2/14), at 153. He recounted that Young transferred pills from D Section to Sections F & G by use of a string

---

[17] Stevenson did not supply contraband to White from the summer of 2012 to October 2012, due to an argument with White. ECF 1760 at 189-90.

[18] Ralph Timmons, Jr., known as "Boosa" (ECF 1755 at 120), was White's half-brother. He was among the many individuals indicted in this case. However, he was the victim of a homicide in April 2013 (ECF 270) and thus the charges against him were dismissed. *See* ECF 271.

In the FBI interview of Stevenson on December 7, 2017, Stevenson stated that after her dispute with White had ended, she only obtained pills from Timmons. He gave her 200-500 Percocet pills at a time, either 30 mg. or 7.5 mg. in strength, which she delivered to White about once a week. *See* ECF 2057-7-2 at 1.

running along a vertical pipe between the floors. *Id.* White testified: "So, I mean, all the time, like you just send it up or send it down." ECF 1758 (Tr. of 12/15/14) at 153-54. In addition, White testified that Young sometimes personally carried the pills "upstairs" and "handed them" to White. *Id.* at 153; *see also* ECF 2051-7 at 1.

On cross-examination of White, Mr. Bardos expressly asked, ECF 1758 at 8: "And you never got any pills from Mr. Young?" Answer: "Yes." Question: "You got pills from Mr. Young?" Answer: "Yes." Question: "Directly from him?" Answer: "Yes." Question: "He handed them to you?" Answer: "Yes." The reference to pills was Percocet pills, as Mr. Bardos elicited on cross-examination of White. *Id.* at 6-7. However, as the defense points out, there was no testimony as to the number of pills provided by Young to White, or the milligram strength. ECF 2016 at 22.

The defense correctly points out that at trial White testified that, apart from Dennis and Reese, he knew of no one else who supplied Young with contraband. ECF 2016 at 22; *see* ECF 1756 at 81, 93. But, the evidence at trial showed that Dennis and Reese were not Young's only suppliers, nor was the contraband only for Young's personal use.

Former Correctional Officer ("C.O.") Jasmine Jones testified pursuant to a plea agreement. She was assigned to the section where Young was housed. She testified that Young sold contraband. ECF 1765 (Tr. of 1/7/15), at 38. She explained that she knew of his conduct because she saw it and she knew that Officer Briscoe brought the contraband to Young, consisting of tobacco and Percocet pills. *Id.* at 38, 99. As to the contraband, Jones said: "I seen it . . . ." *Id.* at 38; *see also id.* at 98. Jones observed Briscoe bring items to Young, and Briscoe told her it was tobacco and pills. *Id.* at 38-39, 100-101; 150. On cross-examination, however, Jones said that she did not know what Briscoe gave Young. *Id.* at 101.

Randolph Edmonds was detained as an inmate at BCDC from July to December of 2012. ECF 1766 (Tr. of 1/8/15), at 7. He testified, pursuant to a plea agreement with regard to an unrelated drug charge. *Id.* at 5-7. Edmonds admitted that he was involved in smuggling tobacco, marijuana, and "strips" at BCDC. *Id.* at 8. Edmonds used some of the items for himself and also sold some of the contraband. *Id.* But, he stated that BGF controlled the smuggling of contraband at BCDC, and he was not a member of BGF. *Id.* at 8-9.

Edmonds testified that his BCDC cellmate, "Buck-em," was a BGF member who was involved in the smuggling of contraband. *Id.* at 9, 11-12; *see* ECF 2031-16 at 4.[19] In particular, Buck-em smuggled marijuana, Percocet pills, strips, tobacco, and cell phones. ECF 1766 at 12, 21. According to Edmonds, "Buck-em" was one of Young's customers.

In the summer of 2012, Edmonds overheard discussions between Buck-em and Young concerning contraband. *Id.* at 23-24. Some of the conversations took place via cell phone, while "on speaker." ECF 2031-16 at 2. Buck-em would tell Young "how much money he had" (*id.*) and "what he want." *Id.* at 4. Buck-em would "order" contraband from Young (*id.* at 25), including tobacco, strips, pills, marijuana, and cell phones, and all but the phones would "come up through the pipe" that ran between the floors *Id.* at 26; *see also id.* at 3, 27.[20] In particular, he corroborated White's testimony that Young transported contraband between floors by tying a string around the contraband and transporting it up and down through pipes between the floors. *See* ECF 2031-16 at 5. Moreover, Edmonds said that he saw the contraband for himself. *Id.* at 4.

---

[19] This individual is also called "Buck-ems." *See*, *e.g.*, ECF 2031-16 at 4.

[20] Cell phones were delivered by the sanitation workers. *Id.* at 4, 8.

Former C.O. Tanierdra Finch testified that Young had a contraband business.  ECF 1751 (Tr. of 11/20/14), at 202.  She knew this because Young "tried to recruit" her to "bring in drugs." *Id.*  And, he tried to do so on two occasions, asking her to provide marijuana.  *Id.* at 202-203.

Milsheena Peoples, another former C.O., testified that she smuggled tobacco, marijuana, and Percocet pills into BCDC at the relevant time.  ECF 1766 (Tr. of 1/8/15), at 100-103.  Peoples, who knew "Monster" (*id.* at 112), testified that Monster asked her to "direct" him to the person who could bring in contraband.  *Id.* at 115.  She also witnessed Reese smuggle something to Young while in the visitor room.  *Id.* at 115-16.  And, she stated that Young and Reese constantly asked another C.O. about "bringing in the stuff."  *Id.* at 117.

A phone call took place on November 7, 2012, between Cyrus Beads and Joseph Young, which was intercepted.  *See* ECF 2031-17.  Young said, in part:  "[Y]ou can get three hundred for a can, right?  . . . Just send me back three . . . ."  *Id.* at 1.[21]  Further, Young said, *id.*:  "Listen, I'm tryin' to buy some more, right?"  ECF 2031-17 at 1.  Young also said:  "Like we just gotta network where as though ya'll try to hold that side down like sometime try 'hittin' 'em in 'L' and I'm sayin' I'm a plug in with somebody up there where as though they're reliable where you go and give 'em shit they send the money back . . . ."  *Id.* at 1-2.

In reference to "Loud," *i.e.*, marijuana, Young also said:  "Bag up ah, twenty-eight bags of weed, sell it for fifty dollars so each ounce of Loud we'll make fourteen hundred dollars.  The biggest fifties in the jail."  *Id.* at 2.  Further, he directed Beads as follows:  "Put one gram fifties. . . . But the whole time, we at least gonna make fourteen hundred off of each joint so even though we paid four hundred per ounce, we still makin' a thousand dollars profit."  *Id.*  Young

---

[21] This conversation may refer to marijuana or tobacco.  However, it is relevant to establish defendant's involvement in the trafficking of contraband in the RICO enterprise and his role in the offense.

continued: "So I already got the weed man and shit. What I'm a do is try to get yo to sell it to us for three-fifty. I'm sayin,' even what I might do is send you ah, like enough 'brown.' You could sell it or whatever, and get like three-fifty [UI], and that way that'll be an ounce right there we got." *Id.* at 2-3. In addition, Young said: ". . . I'll probably need you to really like since you're in the hallway, to fuck with niggers up on M & L and ah, and up on ah, on S. Up there everybody gonna want the, been wantin' them bags . . . and we're gonna try to stay with the strips too, the, bute strips." *Id.* at 3. And, Young said, *id.*: "[B]ut we just gonna keep floodin' 'em . . . [w]e just need a steady flow of everything . . . . Like with that Loud . . . ."

White testified at trial that he and Young would see each other while at BCDC, as Young "used to come upstairs." ECF 1758 (Tr. of 12/15/14), at 26. Nevertheless, White acknowledged that he and Young "didn't always hold a conversation . . . ." (*id.*) and there "wasn't a lot of communication between" the two. ECF 1756 (Tr. of 12/3/14), at 119. Nor were there a lot of phone calls, although both had access to cell phones. *Id.*

White believed that Young was attempting to take his "spot" as leader at BCDC. ECF 1758 (Tr. of 12/15/14) at 16. This created friction between the two men. According to White, Young was a "problem" for White, in the "sense of trying to make [White] look bad, like allowing things to go on in the jail." *Id.* at 18; *see also* ECF 2051-9.

The animosity between White and Young is reflected in three phone calls that took place on January 4, 2013. The first occurred at 3:38 p.m., when White received a call from Will Barnett. *See* ECF 2076-1. According to White, Barnett was a high ranking BGF member, not incarcerated at BCDC, with the nickname "Fat Will." ECF 1756 (Tr. 12/3/14), at 100. Barnett called White, asking: "[W]hat the hell is going on man. I have been getting [a] whole bunch of fucking calls . . . ." ECF 2076-1 at 1. Barnett indicated that Young was one of the people who

had complained to Barnett.  *Id.* at 4.  White acknowledge that he and Young "don't see through the same eyes."  *Id.* at 5.  According to White, Young preferred to deal with issues "through violence."  *Id.*

Soon after, at about 4:05 p.m., White called Young.  ECF 2067-12; ECF 2076-1 at 7.  That phone conversation lasted more than 20 minutes.  ECF 2076-12 at 1.  It reflects discord, but also much more about the issues pertinent to resentencing.

White told Young that "[a] couple other brothers" felt that Young was trying to "get [White's] spot . . . ."  ECF 2067-12 at 1; *see also id.* at 10 (claiming that "a couple brothers" told White that Young "really want [White's] spot."  *Id.* at 1.  White said, *id.*:  "If you want it . . . you can have it."  *Id.* at 1.  And, White stated that Young had let him down because Young was "tryin to make [White] look bad . . . ."  *Id.*

White was clearly dismayed that Young made calls to the outside to complain about White.  *Id.* at 2.  White claimed that he was "not power struck" and, clearly contrasting himself with Young, added:  "I don't always attack with violence."  *Id.* at 1.  White added, *id.* at 2:  "[Y]ou just deal with things a whole lot differently than me."  White continued, *id.*:  "[W]e gonna come to an agreement as . . . a whole, as a consensus . . . ."  Of import here, White also said, *id.*:  "We can sit down and talk . . . *and go over everything* . . . ."  (Emphasis added.)  And, White also said, *id.*:  "I'm pretty sure you got full control of [your floor]."

In addition, White said, *id.* at 8:  "[O]ur communication is, is not like it's supposed to be with each other yo.  We supposed to at least speak to each other at least once a day . . . ."  Further, White said, *id.* at 9-10:  "You can control . . . that environment.  You can dictate that environment . . . . I would try my best to make you look good . . . ."  Young responded:  "All right."  *Id.* at 10.  Young added, *id.*:  "I mind my business . . . .  I'm in the, in the shadows . . . I

don't want the spotlight . . . ." In addition, Young said, *id.* at 11: "I don't be like I'm on the floor . . . but at the same time, like I'm out there trappin'. We all in the same environment together . . . ."

 "Fat Boy" was mentioned several times by White during the conversation. *Id.* at 2, 3, 4. White told Young he had spoken to Fat Boy and "[h]e'll tell you." *Id.* at 4; *see also id.* at 5, 9 (referencing "Fat Boy"). As indicated, Stevenson testified at trial that Fat Boy was her source of supply for Percocet pills. *See* ECF 1760 (Tr. of 12/17/14), at 185. White also mentioned "Rutt," *i.e.*, Carrington. *Id.* at 1. It seems clear from the context of the conversation that Young knew both Rutt and Fat Boy.

In the conversation, White acknowledged that he and Young "don't never really get to sit and see each other face-to-face . . . ." *Id.* at 2. He suggested that they put their names on the "Jummah list" for a "Muslim thing," which would enable them to get together to meet. *Id.*; *see also id.* at 9.

Young and White engaged in a second conversation on January 4, 2013, which lasted about 12 minutes. ECF 2067-5. Young said that he "could go to a C.O." for information, and did not have "to deal with no brother to find out what's goin' on nowhere in the jail . . . .", because "the C.O. gonna tell me who's who, what's what." *Id.* at 1. He added: "I get my information . . . from the enemy," because "[t]hey know more than . . . a brother know." *Id.* In the phone call, White said he knew the "extent of [his] power" and that he "take[s] everybody [sic] advice . . . ." *Id.* at 2. He also told Young: "[Y]ou can straight call me and say yo look, this [is] what I feel you should do." *Id.*

Further, in discussing the floors at BCDC, White said to Young: "I think my floor's the only one that really in compliance with everything . . . I think my floor's the only one

that . . . send what we supposed to send, where it's 'posed to be goin'." ECF 2067-5 at 2. He also told Young: "I know you can handle it. I know you can dictate. I know you can restore the order down there." *Id.* at 3. Young responded: "Yeah." *Id.* White continued: "You see somebody out of line, out of order man, you know how to deal with it. . . . It's like them brothers . . . feel like they don't have . . . no laws or nothin' that they gotta bide by." *Id.* Young responded: "I let dudes do what they gonna do . . . long as I don't see 'em breakin' no laws . . . ." *Id.* And, White said, *id.* at 4: "[I]f you give a direct, they must follow that . . . ."

White reiterated his concern that Young allowed "shit to go on" at his floor to make it "look bad on" White. *Id.* at 5; *see also id.* at 4. White indicated that they each had their "own," but White offered to "assist" Young with "finances." *Id.* at 5. In addition, they discussed the appointment of "Tier heads" who are "capable of running it." *Id.* at 6-7. There were also additional references to "Fat Boy." *Id.* at 2, 3, 4. And, there were references to other individuals, seemingly known to both defendants, who were involved in RICO activities at BCDC. *Id.* at 6-7. And, Young agreed to get on the Jummah list. *Id.* at 6 (stating, "All right").

### D. Drug Quantity

To be sure, the government has not established with precision the quantity of CDS foreseeable and attributable to Young in connection with his involvement in the RICO conspiracy, and it concedes that it cannot do so. ECF 2031 at 10. But, such a precise calculation is not required in a case like this one, involving a pervasive drug distribution enterprise, where few drug seizures actually occurred.

In regard to the issue of reasonable foreseeability, Judge Motz succinctly but accurately summed up the matter at the initial sentencing, stating that Young "knew what was going on." ECF 2006-3 at 2. Indeed, in a phone call between White and Young on January 4, 2013 (ECF

2067-12), White made clear: "[W]e gonna come to an agreement . . . a consensus . . . I don't like to just make no decisions on my own . . . ." *Id.* This and other evidence strongly indicates that Young was aware of the extent of the enterprise.

Based on the evidence as to Young's personal involvement with drug trafficking during his incarceration; Young's stature in BGF, as a Bushman who outranked White and a person with considerable authority, particularly as to the floor of BCDC where he was detained; BGF's extensive drug trafficking organization at BCDC, of which Young was a part; and the many participants in the conspiracy, I am satisfied that the smuggling of Percocet pills into BCDC was within the scope of the jointly undertaken criminal enterprise and in furtherance of it. Moreover, as to Young, the criteria of U.S.S.G. § 1B1.3(a)(1)(B)(i)-(iii) have been met with respect to a drug quantity of at least Level 20, which only requires 300 Percocet pills of 30 milligrams each, or 600 Percocets of 15 milligrams each. Put another way, this drug quantity was clearly foreseeable to Young.

### E. Specific Offense Characteristics

Having determined that Young is accountable for a quantity of drugs corresponding to at least a Base Offense Level of 20 under § 2D1.1(a), I must consider the applicable Specific Offense Characteristics set out in § 2D1.1(b). In doing so, I incorporate the facts discussed in Section III(C) of this Memorandum Opinion.

Clearly, "the object of the offense was the distribution of a controlled substance in a prison, correctional facility, or detention facility." Therefore, § 2D1.1(b)(4) applies, and the offense level is increased by two. And, the evidence demonstrates that Young "bribed, or attempted to bribe, a law enforcement officer to facilitate the commission of the offense." U.S.S.G. § 2D1.1(b)(11). Accordingly, two more levels are added.

The PSR also found that Young "directed the use of violence," and applied a two-level enhancement under § 2D1.1(b)(2). I agree that this Specific Offense Characteristic is appropriate. Young's use of violence went hand in glove with his role in the conspiracy. As support, I shall recount a few instances of Young's violent behavior.

In a letter found during a search of Reese's bedroom in May 2012 (ECF 2070-2), Young wrote to his girlfriend, bragging about a robbery of an inmate that he committed at BCDC. He wrote, in part: "Yesterday me and a few brother's [sic] pushed up on this bro . . . we beat and rob him, first of all when I asked him . . . for his tenth (10%),[22] he was like, ok then he tried [sic] to play games. So then he gave one of the Bros some green [i.e., marijuana]. I'm like no one asked for that ware's [sic] the money[?] So I head butt him then I walked away . . . I'm trying to make sure the other bro's don't get put on the wall or anything . . . ." ECF 2070-2 at 37; *see also* ECF 1759 (Tr. of 12/16/14), at 40.

At trial, White was asked why he and Young did not get along. ECF 1758 (Tr. 12/15/14), at 156. White explained, *id.* at 157: "Because I liked to look into a situation more thoroughly. And he [*i.e.*, Young] wanted to just, his call would just be attack, attack." Over objection, White also testified that various BGF members carried out orders from Young. *See*, *e.g.*, ECF 1758 at 158. For example, White testified about an incident involving Derius Duncan on September 29, 2012, which was committed by David Warren, known as Meshawn, and Brandon Brown, known as Meatball. In particular, the pair took Duncan's contraband, including drugs and his cell phone, which C.O. Dennis had delivered to Duncan. *See* ECF 1755 (Tr. of 12/2/14), at 190-192; *see also* ECF 2006-8 at 1-3, 7-9.

---

[22] The evidence at trial showed that non-BGF members paid a "tax" of 10% in order to sell contraband.

According to White, Young "was behind the robbery" of Duncan. ECF 1755 at 192; ECF 2006-8 at 3. White stated that Duncan, a BGF member and a coconspirator, told White who had robbed him. However, Young also said that Duncan's possessions were "stole[n]" while Duncan was at the gym. ECF 1755 at 190-191. As Young correctly observes (ECF 2083 at 4), such conduct is theft, not robbery.[23] In any event, White claimed that Meshawn and Meatball told him that Monster authorized the occurrence with regard to Duncan. ECF 1755 at 193-95. White testified that he told Young to sanction Meshawn and Meatball for the robbery of Duncan. ECF 2006-8 at 12. However, Young did not do so. *Id.* at 13. White suggested that this was because the pair acted in accordance with Young's instructions. *Id.* at 12-13.

Judge Motz struck, as prejudicial, the portion of White's testimony involving the robbery of or theft from Duncan. *See* ECF 1755 at 196. Nonetheless, for purposes of sentencing, it is relevant. And, during Dennis's FBI interview on August 8, 2013, she recounted the same occurrence as to Duncan. *See* ECF 2081-1 at 7 (Form 302 of FBI interview of Dennis on August 8, 2013).

During a bench conference at the trial, Mr. Bardos objected to evidence in which Young allegedly ordered the stabbing of a federal witness named "T-Roni" or "T-Roney," as well as evidence that someone named "Twin" was stabbed at Young's direction. *See* ECF 1756 (Tr. of 12/3/14), at 6-7; *see also* ECF 2006-8 at 14. Judge Motz sustained the objection. ECF 1756 at 8. White also testified that Young was "behind the extortion" that took place on the first floor pertaining to non-BGF members. ECF 1756 (Tr. 12/3/14), at 83.

---

[23] The Court notes that persons unsophisticated in the law often do not know the difference between stealing and robbing. There is no suggestion that White intentionally described the incident as a robbery instead of a theft. Notably, in an FBI interview of White on June 11, 2013, defendant recounted that "Meatball and Meshawn had *stolen* marijuana and a phone" from Duncan. ECF 2081-2 at 4 (emphasis added).

In addition, according to White, his friend, "Ack" or "Ock," *i.e.*, Akeem Thompson, was robbed while detained at BCDC. ECF 2006-8 at 14; *see* ECF 1755 at 170; ECF 1756 at 74; ECF 2081 at 4. Ack was also a supplier of contraband. ECF 1755 at 171, 185, 187-88. White's accusation at trial is supported by White's statements to the FBI during an interview on June 11, 2013, in the presence of White's lawyer and the prosecutors. *See* ECF 2081-2 (FBI Form 302). According to White, Thompson smuggled prescription pills and marijuana, and "[a]t some point Monster had Ock stabbed." *Id.* at 3. White claimed that he and "Monster talked about Ock. Monster directed Little Ty and Ant to rob Ock, but Ock resisted, so they had him stabbed." *Id.*

Given the ample evidence that "the defendant used violence, made a credible threat to use violence, or directed the use of violence," I shall apply the two-level enhancement. U.S.S.G. § 2D1.1(b)(2).

Thus, with a Base Offense Level of 20 and three applicable two-level Specific Offense Characteristics, Young's offense level under § 2D1.1 is 26, consistent with the determination in the PSR. ECF 1643, ¶ 26.

## IV.    Money Laundering

The jury found Young guilty of money laundering, both as a predicate racketeering activity in Count One and as to the money laundering conspiracy charged in Count Three.

The evidence at trial showed that Young made use of a Green Dot account and Money Paks to pay both Reese and Dennis. Evidence was recovered from Young's cell phone that contained Money Pak numbers.

Young argues that the only laundered funds are the $1,250 that Young paid to Dennis for the purchase of tobacco. However, I am satisfied that Young laundered other funds in relation to the drug conspiracy. For example, as discussed, Reese and Young laundered drug-related funds

by loading money onto Green Dot cards to facilitate drug payments. ECF 977, ¶ 6. Because the laundered funds were derived from the underlying drug offense, the Base Offense Level for the money laundering count is 26, as discussed, *supra*, and as was found in the PSR. *See* ECF 1643, ¶ 26.

Moreover, it is undisputed that Young was convicted for money laundering under 18 U.S.C. § 1956. ECF 1425. As a result, a two-level increase in the offense level is applied, pursuant to U.S.S.G. § 2S1.1(b)(2)(B). Young's offense level for the money laundering count is therefore 28.

## V.     Racketeering Offense

As discussed, the applicable guideline for a violation of 18 U.S.C. § 1962(d), the racketeering offense, is found in U.S.S.G. § 2E1.1(a). It provides that the "Base Offense Level" is the greater of (1) 19 or (2) "the offense level applicable to the underlying racketeering activity." Because the two underlying racketeering activities correspond to the two other counts of conviction, the offense level under § 2E1.1 would be (1) 19, the alternative minimum Base Offense Level for racketeering conduct, per § 2E1.1 cmt. 3; (2) 26, for the drug conspiracy; or (3) 28, for money laundering. Consequently, 28 becomes the offense level for the racketeering offense.

## VI.     Role in the Offense

### A.  Relevant Facts

In addressing role in the offense, I incorporate here the pertinent factual recitation set forth in Section III(C), *supra*.

The government maintains that Young "was clearly the #2 commander in the BGF and the overall commander-in-waiting of the whole prison complex." ECF 2006 at 16. Young

vigorously disagrees, arguing that the government has conflated Young's position in BGF with his position in the relevant conspiracy. *See* ECF 2016 at 8-10.

The RICO conspiracy involved more than five persons. And, without question, Young exercised control over others. At a minimum, the evidence supports the application of a three-level increase for Young's role in the offense.

As indicated, White described himself as the "overseer of the jail." ECF 2051-4; *see* ECF 1754 (Tr. of 12/2/14), at 153. He believed that Young wanted his job "as commander of BCDC[.]" ECF 1756 (Tr. of 12/3/14), at 64. White was unable to sanction Young, however, because Young held the rank of a Bushman in BGF, and thus he outranked White in BGF. *Id.* White testified that he asked Young "to oversee" his floor at BCDC. *Id.* at 65. That floor contained Sections C and D in the south building. *Id.*

A text message from Young to Dennis on October 23, 2012 (ECF 2070-3 at 16), is pertinent. Young wrote: "Im not mean at all but I got to keep people in line. Im all about money power and respect[.]"

The intercepted phone calls between Young and White on January 4, 2013 (ECF 2067-12; ECF 2067-5), are also revealing. White told Young that it seemed that Young was "trying to ah, get [his] spot . . . ." ECF 2067-12 at 1. White also said, *id.*: "If you want it . . . you can have it . . . I'm not power struck . . . ." White conveyed his dismay with regard to Young's complaints to the "outside" when he was dissatisfied with White, and wanted to talk to Young "face-to-face." *Id.* In the twenty-minute conversation, Young asserted, *id.* at 1: "I mind my business . . . I'm in the, in the shadows." *Id.* at 10. But, Young added: "I make sure shit get done . . . ." *Id.*

As indicated, former C.O. Jasmine Jones testified pursuant to a plea agreement. ECF 1765 (Tr. of 1/7/15), at 4-6. Jones worked as a C.O. from March 2008 until April 2013. *Id.* at 6. She testified that Young "was like in control of D Section." *Id.* at 37. Moreover, White told her that Young was in line to take over White's position. *Id.* at 39-40.

Former C.O. Tanierdra Finch testified that, when she had "trouble" with inmates, the inmates were responsive to Young when he told them to lock in. ECF 1751 at 203- 204. According to Finch, other inmates appeared to obey him. *Id.*

C.O. Jalessa Dorsey worked at BCDC since 2011. ECF 1759 (Tr. of 12/16/14), at 150. She testified that Carrington told her that if White left BCDC, Young would run the organization. *Id.* at 132. Judge Motz later struck the testimony, because the statement was not made in furtherance of the RICO conspiracy. However, as discussed earlier, at sentencing the Court may consider such testimony, which is essentially cumulative in any event.

## B. Application of Guidelines

A defendant's offense level is subject to a four-level increase "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). If the defendant was a manager or supervisor in regard to criminal activity involving five or more participants, he is subject to a three-level increase. U.S.S.G. § 3B1.1(b). And, under § 3B1.1(c), the defendant is subject to a two-level increase if he was an organizer, leader, manager, or supervisor in any criminal activity, without regard to size.

As noted, the PSR suggested a four-level increase, with which the government agreed. However, Judge Motz found that defendant was subject to a two-level increase.[24]

Under Application Note 4, the following factors are pertinent to whether and to what role adjustment is warranted: (1) the exercise of decision making authority; (2) the nature of participation in commission of the offense; (3) the recruitment of accomplices; (4) the claimed right to a larger share of the fruits of the crime; (5) the degree of participation in planning or organizing the offense; (6) the nature and scope of the illegal activity; and (7) the degree of control and authority exercised over others. *See United States v. Kellam*, 568 F.3d 125, 148 (4th Cir. 2009) (per curiam); *see also United States v. Ford-Bey*, 657 F. App'x 219 (2016) (per curiam). *See generally United States v. Kimmel*, 644 F. App'x 231 (2016) (per curiam); *United States v. Steffen*, 741 F.3d 411 (4th Cir. 2013); *United States v. Thorson*, 633 F.3d 312 (4th Cir. 2011); *United States v. Slade*, 631 F.3d 185 (4th Cir. 2011); *United States v. Campbell*, 354 F. App'x 786 (4th Cir. 2009); and *United States v. Woody*, 291 F. App'x 541 (4th Cir. 2008).

Notably, "a defendant need only exercise control over one other participant in order to be deemed a leader or organizer." *Ford-Bey*, 657 F. App'x at 220; U.S.S.G. § 3B1.1 cmt. 2. And, as the Fourth Circuit has recognized, "[t]his is 'not a particularly onerous showing,' requiring 'only a conclusion that [the defendant] supervised at least one . . . participant,' and it 'does not require the court to identify specific examples.'" (citing *United States v. Hamilton*, 587 F.3d 1199, 1222 (10th Cir. 2009)). Moreover, if the court determines that the defendant exercised some control over at least one participant, it need not look further into whether defendant

---

[24] Because the criminal activity indisputably involved five or more participants, § 3B1.1(c) (providing for a two-level increase) is inapplicable. The question is whether Young's role merits a three- or a four-level increase. In response to the Court's inquiry as to this point at the hearing on March 1, 2018, the government and the defense agree that a two-level enhancement would not apply in a case with more than 5 persons. *See* ECF 2081 at 3 (government); ECF 2083 at 3 (Young).

exercised control over others. *Ford-Bey*, 657 F. App'x at 221 (citing *Hamilton*, 587 F.3d at 1223).

It is undisputed that the RICO organization consisted of far more than five people. And, the evidence readily established that Young was a high ranking leader of the BGF organization who exercised considerable control over the inmates on his tier.

Defendant contends that his membership in BGF is not the same as membership in the RICO conspiracy. But, the evidence supports the conclusion that, in the context of this case, they were inextricably intertwined. Therefore, a three-level upward adjustment is warranted.

This results in a total offense level of 31.

## VII.    Criminal History

The PSR found a criminal history score of 10 points, indicating a criminal history category of V. The PSR found that Young had three prior convictions: one in 2001, for two criminal history points; and two others, in 2001 and 2007, for three points each. These resulted in a total of eight points. ECF 1643, ¶¶ 39-41. The PSR also found: "The defendant committed the instant offense while under a criminal justice sentence for [the 2007 conviction]; therefore, two points are added. USSG § 4A1.1(d)." *Id.* ¶ 43. This gave Young a total criminal history score of 10, which corresponds to a criminal history category of V.

In a footnote on page 10 of Young's resentencing memorandum, the defense argues that the criminal history category of V is inaccurate because Young's probation for the 2007 conviction (the source of two points) had ended by the time he arrived at BCDC in 2012. ECF 2016 at 10 n.3. Accordingly, the defense asserts that Young could not possibly have been on probation when he committed the instant offenses, and therefore his criminal history score is

properly calculated as eight points.  *Id.* at 30.[25]  This would result in a criminal history category of IV.

The PSR notes that on July 6, 2011, the probationary "[c]ase [was] closed due to expiration of sentence."  ECF 1643, ¶ 41.  Therefore, I concur with the defense that the PSR miscalculated Young's criminal history score when it added two points under § 4A1.1(d).  The proper criminal history score is eight, resulting in a criminal history category of IV.

## VIII.   Conclusion

The evidence presented shows that Young was a manager or supervisor in a criminal conspiracy of more than five people, based in a correctional facility.  Young laundered funds, bribed and attempted to bribe correctional officers, and used and threatened violence in support of a jointly undertaken drug distribution enterprise.  From his position, he could reasonably foresee the distribution of a quantity of CDS corresponding to at least a Base Offense Level of 20 under U.S.S.G. § 2D1.1(c).  Three Specific Offense Characteristics apply under § 2D1.1 to increase the Base Offense Level of 20 to and offense level of 26: violence, under § 2D1.1(b)(2); distribution in a correctional facility, under § 2D1.1(b)(4); and bribery of a law enforcement officer, under § 2D1.1(b)(11).

This offense level of 26 is then taken as the Base Offense Level for the money laundering count under § 2S1.1(a)(1), because Young was convicted of conspiracy to distribute CDS, and that offense was the underlying offense from which the laundered funds were derived.  This Base Offense Level of 26 is increased by 2, pursuant to § 2S1.1(b)(2)(B), because Young was convicted of money laundering under 18 U.S.C. § 1956.  His offense level for the money laundering count is therefore 28.

---

[25] In its response (ECF 2031), the government does not address criminal history.

The Guidelines instruct that the Base Offense Level for the racketeering count is the offense level of the most serious underlying racketeering activity, which in this case is the money laundering. *See* U.S.S.G. § 2E1.1(a)(2). Given that this section of the Guidelines has no additional Specific Offense Characteristics, the offense levels for the racketeering count and the money laundering count are equivalent.

Section 3D1.3, "Offense Level Applicable to Each Group of Closely Related Counts," is also relevant. It provides, in pertinent part: "Determine the offense level applicable to each of the Groups as follows: (a) In the case of counts grouped together pursuant to § 3D1.2(a)-(c), the offense level applicable to a Group is the offense level, determined in accordance with Chapter Two and Parts A, B, and C of Chapter Three, for the most serious of the counts comprising the Group, *i.e.*, the highest offense level of the counts in the Group." Young's three counts of conviction are appropriately grouped together under § 3D1.2(b) and (d), so 28 is the offense level for the entire group.

I have determined that Young was a "manager or supervisor," and that "the criminal activity involved five or more participants," resulting in an upward adjustment of three levels. I note that this is the only way in which my findings depart from those of the PSR with respect to the offense level calculation. The PSR suggested a four-level adjustment. *See* ECF 1643, ¶ 29.

In sum, I conclude that Young's conduct demands an offense level of 31 under the Guidelines. With his criminal history category of IV, this results in a Guidelines Range of 151-188 months of imprisonment. *See* U.S.S.G. § 5A.

An Order follows.

Date: March 22, 2018         _____/s/_____
                                          Ellen Lipton Hollander
                                          United States District Judge